IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DANNY GREG UECKER,

                    Petitioner,

          vs.

JAMES A. YATES, Warden, Pleasant
Valley State Prison,

                    Respondent.

No. 2:10-cv-02291-JKS

MEMORANDUM DECISION

Danny Greg Uecker, a state prisoner appearing *pro se*, filed a Petition for Habeas Corpus under 28 U.S.C. § 2254.  Uecker is currently in the custody of the California Department of Corrections and Rehabilitation, incarcerated at the Pleasant Valley State Prison.  Respondent has answered.  Uecker has not replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

In January 2008 following a jury trial, Uecker was convicted in the Shasta County Superior Court of two counts of Stalking under California Penal Code § 646.9(a).  The trial court sentenced Uecker under the "three-strikes" law, Cal Penal. Code §§ 667(a), 1170.12, to consecutive terms of twenty-five years to life, for an aggregate sentence of fifty years to life.  The California Court of Appeal, Third Appellate District, affirmed Uecker's conviction and sentence in a published decision,[1] and the California Supreme Court denied review on July 15, 2009.  On November 19, 2009, Uecker filed a petition for habeas relief in the Shasta County Superior

_____

[1] *People v. Uecker*, 91 Cal. Rptr. 3d 355 (Ct. App. 2009).

Court, which denied his petition in an unreported, reasoned decision on December 11, 2009.  On

March 5, 2010, Uecker filed a second petition for habeas relief in the Shasta County Superior

Court, which was denied on April 2, 2010.  On February 24, 2010, Uecker filed a petition for

habeas relief in the California Supreme Court, which was summarily denied without opinion or

citation to authority on September 22, 2010.  Uecker timely filed his Petition for relief in the

Northern District on August 8, 2010, which transferred the matter to this Court.  Uecker filed his

Amended Petition in this Court on September 23, 2010.

     The factual and procedural background underlying Uecker's conviction were summarized

by the Court of Appeal.

A

*Count 1—Stalking Of M.*

     M. is a service representative at the Social Security Administration in Shasta
County.  Her first encounter with [Uecker] was at her work parking lot around the
end of May or beginning of June 2006 when she noticed him sitting by her white
Mustang between noon and 1:00 p.m.  [Uecker] was on his bicycle, parked three to
four feet from her car.  M. commented that bicycling was good exercise.  Thereafter,
[Uecker] would be beside M.'s car every day when she would go to lunch, even when
her lunch hour varied.  They would exchange greetings, and [Uecker] sometimes
would try to engage M. in further conversation.  On occasion M. would oblige, but
she always would say she had to get back to work because she was running late.  She
was polite to [Uecker] because her job taught her to treat human beings with kindness
and respond to their conversation.  This pattern continued week after week, month
after month.

     About the same time [Uecker] starting hanging around M.'s car, he started
leaving notes for her on her car.  The first note included his telephone number and
read as follows:  "'If you want to go riding bicycles, give me a call.'"  M. ripped up
the note and threw it away because she "wasn't interested."

     In September, M. started parking on the street because she no longer needed
the shade the original parking spot provided and somebody else had started parking
in her spot.  [Uecker] approached her at her new spot and asked whether she was
trying to "'get away from [him].'"  She said "'[n]o.'"  He continued showing up at
her new parking spot, leaving her notes and trying to engage her in conversation.
One of these notes read as follows:  "'I'm not a homeless guy.  I have a job.  I have
a roof over my head.  I want to go out with you.'"  She threw it away and did not talk
to him about the note.  His behavior was beginning to concern M., and she decided

2

she needed to "prepare for stuff" "if he got crazy or something." She bought mace and started taking "evasive" actions by moving her car.

But [Uecker] persisted. His next note was a Christmas card that read as follows: "[M.], [¶] I hope you have a nice holiday season! I know how we met is a little rare, and I look like a transient on the side of the road but I can assure you I do have a full time job and a roof over my head. [Smiley face.] Listen, no strings attached, if ever you want to call sometime just to talk, I'm open for it, if you haven't lost my number? Its [*sic*] really nice talking to you as an attractive, mature lady! I'm not looking for anything super serious but I wouldn't mind the companionship on a cold, rainy day, sipping hot chocolate. [Smiley face.] [¶] Danny [¶] P.S. Nice car. [Smiley face.] I like it better than the Mustang." (Capitalization omitted.)

M., who had bought a Toyota Camry a week before, was concerned and terrified [Uecker] knew her every move. She went inside her workplace and talked with the administrative secretary for management, Nancy Patterson, and told her the following: "'Something's not right. This man just doesn't go away. And I don't know what to do anymore. I thought I could handle it on my own.'" M. had now become so fearful of [Uecker] she stopped going out in the evenings and shopping and had her girlfriend stay with her a few times.

The next day, M. was so scared she parked in another location that was 10 feet from her work's exit. As she was walking out of work, [Uecker] approached her on his bicycle and asked if she got his Christmas card. She thanked him but "[f]irm[ly]" said she was "not interested" because she was "seeing someone" and asked whether his statement about her being a mature woman implied she was old. [Uecker] said "no," "got mad," and asked why she had been flirting with him. She said she had not been and was simply responding to his conversation. She then announced she had to go pick up her son, and [Uecker] left.

The following day, M. took a much later than normal lunch because her son was very ill. She did not see [Uecker] but received the following note: "[M.], [¶] I'm not on my bike anymore. The weather is too cold, wet or unpredictable. [¶] I'm in a small brown truck w/ a camper shell. I still spend my lunch hour here because its [*sic*] quiet. I don't like to keep leaving notes on your car. Would much rather talk to you. [Smiley face.] [¶] Ok so you're not mature! You're an immature trouble making brat! Now what? [Smiley face.] [¶] What's a guy gotta do to get a call from a beautiful woman? I'll be here tomorrow if you want to see me. You sure have some funny lunch hours. [Smiley face.] [¶] Dan."

When M. read this note, she "really freaked out." She "started to realize that this is more than just someone interested in dating, that this guy is just watching [her] every move." She "started parking way down the road" so [Uecker] would not be able to see her car, had people walk her to her car, and alerted the guard at her workplace. As with the last note, M. gave it to Patterson. M. did not call the police herself because office protocol required her to go through management.

Patterson spoke to her manager, Linde Ballentine, about the situation, and Ballentine called M. into her office. M. told Ballentine [Uecker] had been leaving notes on her car, "he was now scaring her with some of the things in the notes, [and]

3

that she didn't know how to interpret them."  M. was crying on and off, was shaky, and had to sit down several times.

The following day, December 19, Ballentine saw [Uecker] in his truck eating lunch.  He was positioned "with a good view of the entry to the parking lot where the cars come in" and of the "employee entrance."  Management then contacted law enforcement.

### B
### *Count 2—Stalking Of J.*

J. is a part-time real estate agent in Shasta County who began her career in November 2006.  To generate business, she posted real estate advertisements with her photograph and phone number in local newspapers and magazines.

At the end of November or early December 2006, J. received a phone message from "Danny" saying he was looking for a "livable shack in the boonies for less than 60,000 dollars."  J. returned his call, and when she had found a couple of houses that might work, she asked for his last name so she could mail the information to him.  [Uecker] said it was "Eucker."

[Uecker] then began calling J. a couple of times a day both on her cellular phone and her office line.  She thought his messages were "a little too comfortable and playful."  He joked about his friends coming over and "rid[ing her] horses" after she mentioned she liked the country and had horses.  He told her she had a "really cool voice" and he could "'[p]robably talk to [her] all day.'"  That message left her with a "haunting and violating feeling."  In reference to a listing of property she had found him in "[n]ot the greatest area," he asked if she ever went to check the places out and hinted she should take him there.  She had no intention of doing so because she "wanted to make sure [she] was coming back."  She pressed him for information to help him qualify for a loan, but he never provided any and simply wanted more listings.

During the second week of phone calls, [Uecker] left a message stating he had something to tell J.  He then laughed and said, "'Oh, no, never mind.  If you're curious enough, you'll call back.'"  When J. did not call back, [Uecker] called her a couple of days later and asked if she had received his message.  When she said she had, [Uecker] asked her, "'Do you like surprises?'"  J. responded that she was "'[n]ot particularly fond of them.'"

By now, J. was questioning [Uecker's] credibility.  He had said a friend had referred him to her, which she knew was a lie because [Uecker] was her first client.  J. decided to check Megan's Law database to see if [Uecker] was listed.  When she tried Danny "Eucker" nothing came up.  When she tried Danny "Uecker" she saw [Uecker's] picture with his residence address listed as a hotel.  J. drove by the hotel several times to look at the trucks parked there, since [Uecker] had told her he drove a truck.  She "wanted to get a visual of every truck in there, so in case he pulled up behind [her, she] would know" and "wouldn't get caught off guard."

At some point after she learned defendant was a "sex offender," [Uecker] left a message for her saying he wanted to come by the office.  J. responded by parking her car "far out in the parking lot backwards, so it wouldn't look like a real estate

car," putting her hair in a knot, wearing sweats, and "frump[ing] on in." She asked coworkers to let her know if anybody came to the door looking for her.

A couple of days after their last phone contact, [Uecker] left the following "irate" message: "'I guess that's what you realtors do, you just drop us.'" J. responded with the following message: "'I'm a little offended that, you know, you would speak to me that way because I had been trying to help. Every step of the way. And didn't really appreciate that.'" She falsely told him she was quitting the residential real estate business to focus on commercial real estate and she would send him to someone who could help him. Thereafter, J. decided not to host open houses and asked her manager whether she could put someone else's photograph in the advertisements.

[Uecker] called J. back about three times after her last message. The first two messages were lengthy and extremely apologetic. In one, [Uecker] said the following: "'I started this with you, [J.], because you didn't treat me like everybody else—some other realtors. So, with all due respect, I'd like to finish this with you. But I want to handle this with you—I want you to handle this or at least handle my issues, anyway.'" The message scared her. In another, [Uecker] said the following: "'I'm sorry. I shouldn't have yelled at you like that. I had some words with a buddy at work. It wasn't your fault, but I want you to finish what you've started here with me. I know you're doing the commercial thing, but I want you to finish what you started with me.'" J.'s reaction to the second message was, "this guy is like talking to a girlfriend or something . . . [i]t . . . just . . . didn't s[i]t well, either." The third said, "'Hey, I just want, you know, out of Dodge and by now, you probably know why.'"

J. reported [Uecker's] conduct to law enforcement on December 13, 2006. She was afraid of defendant and felt trapped by him.

In all, [Uecker] called her about 30 times over a three-week period, and of those calls, 6 to 10 were direct conversations.

[Uecker] was arrested on December 21, 2006.

## C

### *Defendant's Conversations With His Cellmate Almeda*

From June 2007 to August 2007, [Uecker] and Richard Almeda shared a cell in the Shasta County Jail. During their time together, [Uecker] told Almeda about his past crimes.

[Uecker] said he had raped 20 women, favoring petite, small women with long brown hair. He preferred women with long hair because "he could wrap their hair around his arm and pull on it backwards." He would get into the victims' lives by drawing them in "under false pretenses." He wanted to buy a cabin in the country when he was released so he could take his young victims there. [Uecker] then described specific acts he had committed.

While in the Army as a teenager, he spent time in prison for beating a woman while trying to take her purse. While in the Army stationed in Germany, he raped a petite woman with long brown hair named K.G. who was a bartender at a "rec club" he frequented. He waited until closing time when K.G. was the only one there, snuck

5

up behind her, forced her into the office, and "started breaking her down mentally" by telling her she could not get away and that he was going to do what he wanted. He then raped her on the couch in the office. [Uecker] was convicted by court martial of assault and battery for this incident.

In 1991 when [Uecker] was approximately 26 years old, he assaulted a petite woman with long black hair named S.A. he met at a gas station. He impersonated an undercover police officer and reprimanded her for swerving. When she drove off, he followed her in his car and flashed his lights to induce her to pull over. His plan was to get her into his truck, tie her up with bungee cords, and rape her. He slapped her in the face, causing her to "fl[y] into [a] ditch." When he tried to get her into his truck, two people in a car stopped by the side of the road, and S.A. called out for help. [Uecker] drove away but eventually was apprehended. As a result of this conduct, defendant was convicted of attempted kidnapping.

Within a few months of attacking S.A., [Uecker] raped R.P. He saw an advertisement for babysitting services and thought the babysitter might be "what he was looking for," i.e., someone with "a nice face, a nice butt and nice, long hair." Using the ruse of babysitting, [Uecker] induced R.P. to come to his trailer. After 20 to 30 minutes of small talk, he announced there were "no kids" and that she was "'here for [him.]'" She put up a struggle, but he was able to rape her three times using "pre-arranged" ropes that were tied to the bed. He also made her wash her hair to "show[ ] her that he [w]as in control over her." As a result of this conduct, [Uecker] was convicted of three felony offenses including forcible rape.

[Uecker] told Almeda he was in custody for stalking a woman who worked at the Social Security office. Laughing, [Uecker] said he wanted to take her on a bike ride on the Sacramento River trail because it was secluded with a lot of bushes and trees.

[Uecker] told Almeda that in the one or two years preceding his arrest in the stalking case, he would go to stores like Winco and follow young women around. He started up a conversation with one store clerk so he could "get close to her" and ultimately rape her.

He once worked for Liddell Construction and made friends with a young lady with long black hair working at the front desk because he wanted to rape her.

After Almeda moved out of [Uecker's] "pod" in August, [Uecker] sent him three letters, which he kept. In one letter dated September 12, 2007, [Uecker] said he was "'thinking about [his] girls all the time and [Almeda was] nowhere to talk to'" and put a "smiley face" next to that sentence. Almeda took that to be a reference to [Uecker's] prior victims. In another letter, [Uecker] referred to a lady with long hair in the Burlington department store advertisement who reminded him of S.A., the one who got away. He also wrote that he might take a look at the phone book tonight "'just for old times['] sake,'" ending the sentence with a "'smiley face.'" In the past, [Uecker] had told Almeda he clipped pictures of young women out of phone books and fantasized about raping them.

D

*Prior–Acts Evidence From Victims And Percipient Witness*

J.T. was in the Army stationed in Germany from 1982 to 1983 when she was 19 years old. At the time, she had long brown hair. About 9 p.m. one night when she was inside the entrance to the gate at the opening to the base, [Uecker] jumped out from behind a building, punched her in the face, and ripped out her hair "very hard." She screamed "over and over," and [Uecker] "took off." [Eucker] was convicted by court martial of assault with intent to commit robbery.

K.L. was 21 years old when [Uecker] married her mother. "[A]t some point," [Uecher] was arrested and while in prison, he sent K.L. a letter threatening that if she did not send him pictures of herself in lingerie, he would "conjure up an affair that [they] never had and that he [would] hurt [her] mom with that . . . ." K.L. was very scared and intimidated by the letter, and her husband "sent it to . . . the authorities."

D.M. worked in the canteen in Mule Creek State Prison in 1996. While she was there, [Uecker] gave her a letter and handkerchief that contained "sexual innuendos." The letter said he wanted to be alone with her, and the handkerchief contained drawings of a woman with long hair and two hearts.[2]

## II.  GROUNDS RAISED/DEFENSES

In his Amended Petition, Uecker raises nine grounds:  (1) insufficiency of the evidence to support his conviction; (2) the trial court erred in allowing into evidence uncharged prior bad acts; (3) the trial court erred by allowing into evidence information that Uecker's name was listed on the "Megan website";[3] (4) the trial court abused its discretion by refusing to strike a sufficient number of priors; (5) the sentence imposed violated the Eighth Amendment's prohibition of cruel and unusual punishment; (6) the trial erred in allowing into evidence Uecker's prior criminal history; (7) the trial judge was biased; (8) ineffective assistance of trial counsel; and (9) the

---

[2] *Uecker*, 91 Cal. Rptr. at 358-63 (some alterations added) (footnotes omitted).  Except for the petitioner's name and the internal footnotes, this is reproduced exactly as it appears in the original.

[3] Named after Megan Kanka, a seven year old girl who was sexually assaulted and murdered, "Megan's website" is a shorthand reference to the registry of known sex offenders.

admission into evidence of his prior criminal history violated the Double Jeopardy and *Ex Post Facto* Clauses.[4]   Respondent asserts no affirmative defenses.[5]

### III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court renders its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[6]  The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."[7]  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.[8]  Thus, where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"[9]  When a claim falls under the

---

[4] Uecker raised his first five grounds in his direct appeal.  The sixth, seventh, eighth, and ninth grounds were raised in his habeas petition to the California Supreme Court.

[5] *See* Rules Governing Section 2254 Cases in the U.S. Dist. Courts, Rule 5(b) (2011).

[6] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

[7] *Williams*, 529 U.S. at 412 (alteration added).

[8] *Early v. Packer*, 537 U.S. 3, 10 (2002).

[9] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations in original) (citation omitted); *see also Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir.

"unreasonable application" prong, a state court's application of Supreme Court precedent must be "objectively unreasonable," not just "incorrect or erroneous."[10]  The Supreme Court has made clear that the objectively unreasonable standard is "a substantially higher threshold" than simply believing that the state-court determination was incorrect.[11]  "[A]bsent a specific constitutional violation, federal habeas corpus review of trial error is limited to whether the error 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"[12]  In a federal habeas proceeding, the standard under which this Court must assess the prejudicial impact of constitutional error in a state court criminal trial is whether the error had a substantial and injurious effect or influence in determining the outcome.[13]  Because state court judgments of conviction and sentence carry a presumption of finality and legality, the petitioner has the burden of showing by a preponderance of the evidence that he or she merits habeas relief.[14]

---

2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).

[10] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[11] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams,* 529 U.S. at 410).

[12] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 643 (1974)).

[13] *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

[14] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (citations omitted); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

The Supreme Court recently underscored the magnitude of the deference required:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin,* 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). *It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther.* Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia,* 443 U.S. 307, 332, n.5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.[15]

In applying this standard, this Court reviews the "last reasoned decision" by the state court.[16] State appellate court decisions that summarily affirm a lower court's opinion without explanation are presumed to have adopted the reasoning of the lower court.[17] This Court gives the presumed decision of the state court the same AEDPA deference that it would give a reasoned decision of the state court.[18]

---

[15] *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (emphasis added).

[16] *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)); *cf. Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991) (explaining "how federal courts in habeas proceedings are to determine whether an unexplained order . . . rests primarily on federal law," and noting that federal courts must start by examining "the last reasoned opinion on the claim . . . . ").

[17] *Ylst*, 501 U.S. at 802-03 ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); *cf. Richter*, 131 S. Ct. at 784 ("As every Court of Appeals to consider the issue has recognized, determining whether a states court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.").

[18] *See Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

Under California's unique habeas procedure, a prisoner who is denied habeas relief in the superior court files a new original petition for relief in the court of appeal. If denied relief by the court of appeal, the defendant has the option of either filing a new original petition for habeas relief or a petition for review of the court of appeal's denial in the California Supreme Court.[19] This is considered as the functional equivalent of the appeal process.[20] Under AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.[21] This presumption applies to state-trial courts and appellate courts alike.[22]

A state court is not required to give reasons before its decision can be deemed to be "adjudicated on the merits."[23] When there is no reasoned state-court decision denying an issue presented to the state, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."[24] "The presumption may be overcome when there is reason to think some other explanation for

---

[19] *See Carey v. Saffold*, 536 U.S. 214, 221-22 (2002) (citations omitted) (discussing California's "original writ" system).

[20] *See id.* at 222 ("Thus, typically a prisoner will seek habeas review in a lower court and later seek appellate review in a higher court . . . .").

[21] 28 U.S.C. § 2254(e)(1); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary . . . ." (citing 28 U.S.C. § 2254(e)(1))).

[22] *See Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004) ("Stevenson does not address these factual findings, let alone challenge them with clear and convincing evidence. Accordingly, we presume them to be correct." (citing 28 U.S.C. § 2254(e)(1); *Pollard v. Galaza*, 290 F.3d 1030, 1035 (9th Cir. 2002))).

[23] *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011).

[24] *Id.* (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)).

the state court's decision is more likely."[25]   Where the presumption applies, this Court must

perform an independent review of the record to ascertain whether the state-court decision was

"objectively unreasonable."[26]   In conducting an independent review of the record, this Court

presumes that the relevant state-court decision rested on federal grounds,[27] giving that presumed

decision the same deference as a reasoned decision.[28]   The scope of this review is for clear error

of the state court ruling on the petition:

> [A]lthough we cannot undertake our review by analyzing the basis for the state
> court's decision, we can view it through the "objectively reasonable" lens ground by
> *Williams*. . . . Federal habeas review is not *de novo* when the state court does not
> supply reasoning for its decision, but an independent review of the record is required
> to determine whether the state court clearly erred in its application of controlling
> federal law.   Only by that examination may we determine whether the state court's
> decision was objectively reasonable.[29]

---

[25] *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).

[26] *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (quoting *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005) (per curiam)).

[27] *See Coleman v. Thompson*, 501 U.S. 722, 740 (1991) ("The presumption at present applies only when it fairly appears that a state court judgment rested primarily on federal law or was interwoven with federal law, that is, in those cases where a federal court has good reason to question whether there is an independent and adequate state ground for the decision."); *see also Harris*, 489 U.S. at 263.

[28] *Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

[29] *Delgado v. Lewis* (*Delgado II*), 223 F.3d 976, 982 (9th Cir. 2000) (citation omitted). *But cf. Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004) ("Our standard of review is not controlled by *Delgado v. Lewis*. . . . There, we held that where a state court provides no rational for a decision, a habeas court does not apply de novo review, but instead determines whether the state decision was objectively unreasonable based on its independent reading of the record.   Here, however, the state court was not silent as to its reasoning. . . .   Therefore, we review de novo whether Lewis waived his right to conflict free counsel . . . .").

"[A]lthough we independently review the record, we still defer to the state court's ultimate decision."[30]

## IV.  DISCUSSION

Five of Uecker's nine grounds fall into two categories.  Grounds two, three, and six all concern evidentiary rulings.  Grounds four and five present sentencing issues.  To avoid unnecessary duplication and for clarity, this Court will discuss grounds two, three, and six as a group, and four and five as a group.

Ground 1:  Insufficiency of the Evidence

Uecker contends that there was insufficient evidence to support his conviction.  The California Court of Appeal rejected Uecker's contention, holding:

### C
*There Was Sufficient Evidence Defendant Stalked M.*

[Uecker] argues there was insufficient evidence of all three elements of stalking, namely:  (1) following or harassing another person; (2) making a credible threat; and (3) intending to place the victim in reasonable fear for her safety.  We take each element in turn, finding sufficient evidence supported all three.

The first element of stalking is "willfully, maliciously, and repeatedly follow[ing] or willfully and maliciously harass[ing] another person." (§ 646.9, subd. (a).)  Here, there was sufficient evidence to support this element.  After M. told [Uecker] firmly she was not interested in him, he got mad.  The next day after she had taken a much later lunch hour than normal, [Uecker] left a note calling her derogatory names.  The day after this note, [Uecker] positioned himself in his car with a good view of the employee entrance.  From this evidence, a reasonable jury could have found defendant purposefully (i.e., willfully) followed M. on more than one occasion (i.e., repeatedly) with the intent to disturb or annoy her (maliciously) after she told him she was not interested in him and refused to acquiesce in his requests to go out with him.

The second element is "mak[ing] a credible threat," which includes a threat implied by a pattern of conduct or a combination of verbal and written communicated statements and conduct.  (§ 646.9, subd. (g).)  Here, [Uecker's] pattern of conduct, his written notes, and verbal statements implied he was going to do whatever it took

---

[30] *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

to get M. to go out with him, reasonably causing M. to fear for her safety.  Almost every work day for approximately seven months, [Uecker] followed M. and/or placed notes on her car.  He would always find her or her car no matter what time she had taken her lunch hour or what location she had parked her car.  When she told him firmly she was not interested in him, he got mad.  The next day, [Uecker] tracked her car down yet again, left her a note stating he did not like to keep leaving notes on her car, she was an "immature trouble making brat" and asking, "Now what" and what he had to do to get a call from a beautiful woman.  When M. read this note, she "really freaked out," "starting parking way down the road" so [Uecker] would not see her car and had people walk her to her car.  The next day, he returned again and positioned himself with a good view of the employee entrance.  From this evidence, a reasonable jury could have found that [Uecker] made an implied threat to her safety in that he was going to do whatever he needed to get M. to go out with him and that she reasonably feared for her safety.  His persistence lasted seven months with no signs of abating, his last conversation with M. and his last note to her evidenced hostility toward her, and his final action of positioning himself where he could see her comings and goings at work signaled he was not going to take no for an answer.

The third element of stalking is intending to place the victim in reasonable fear for safety.  Here, [Uecker's] intent was evidenced by comments in two notes he left for M. explicitly alerting her he had been tracking her.  The first was when he mentioned her new car within the first week she purchased it.  The second was when he mentioned she had "funny lunch hours."  From these comments, a reasonable jury could conclude [Uecker] wanted M. to know he had been watching her while she was parked at work and keeping track of her schedule to place her in fear of her safety.

Taken as a whole, therefore, there was sufficient evidence to support the jury's verdict that [Uecker] stalked M. within the meaning of section 646.9.

### D

*There Was Sufficient Evidence Defendant Stalked J.*

[Uecker] makes a similar sufficiency-of-the-evidence argument with respect to J., challenging all three elements of the crime.  Again, we find sufficient evidence to support the stalking conviction.

As to the first element, there was no evidence [Uecker] followed J., so we focus on the evidence he harassed her within the meaning of the statute.  [Uecker] called J. under the guise of searching for a "livable shack in the boonies for less than 60,000 dollars."  It was apparent [Uecker's] contact with J. was not directed toward the legitimate purpose of buying real estate, as he refused her request to provide her information to help him qualify for a loan, would not give her the correct spelling of his name, and would not tell her the truth about how he got her contact information.  When she tried to cut off contact with him, [Uecker] kept calling her, leaving her one irate message about realtors dropping customers and another message that he wanted to "finish this with [her]" and wanted her to "handle [his] issues."  [Uecker] left her feeling afraid and trapped.  This evidence was sufficient to support the element of harassment.

14

The second element is making a credible threat.  Here, [Uecker's] pattern of conduct in calling J. over 30 times in three weeks despite her desire to cut off contact with him, and his verbal statements in those calls, implied a threat that caused her to reasonably fear for her safety.  He left messages for J. that were "a little too comfortable and playful," ones that left her with a "haunting and violating feeling," and ones that scared her.  He told her he wanted a house in the boonies and then hinted she should take him out in her car to look at the properties.  He told J. that she had a "really cool voice" and he could "'[p]robably talk to [her] all day.'"  He left a message saying he had something to tell her, laughed, and then told her if she was curious enough, she would call back.  When she did not, he asked her if she liked surprises.  He left a message saying he wanted to come by the office.  She changed her parking habits and dress to hide from [Uecker] and would not hold open houses.  When she did not return this call, he left her an irate message about realtors dropping their clients.  When she told him that she was quitting the residential real estate market, he still persisted calling her.  In his last messages, he cryptically told her he wanted to "finish this with [her]," wanted her to "handle [his] issues," and he wanted "out of Dodge and by now, [she] probably kn[e]w why."  It was after this series of calls that J. contacted law enforcement.

Taken as a whole, this conduct implied a threat to J.'s safety.  She knew [Uecker] is a sex offender and [Uecker's] last comment to J. indicated he knew that she knew.  He intimated he wanted to be alone with her, made suggestive comments about her voice, asked if she liked surprises, told her he wanted to come by the office, was irate when she tried to get rid of him, and left cryptic messages on her answering machine.  Simply put, this pattern of unrelenting conduct over the course of three weeks that toward the end became hostile and demanding, perpetrated by someone who is a sex offender and had no legitimate interest in real estate, was sufficient to satisfy this element.

The third element is intending to place the victim in reasonable fear for safety.  Here, it can be inferred defendant intended to place J. in reasonable fear for her safety from his persistent phone contacts with her despite her attempts to end them, his apparent knowledge that she knew he is a registered sex offender, and his hostile and demanding tone in one of his last messages.  This evidence supported not only the conclusion J. reasonably feared [Uecker] and had reason to fear him but also that he acted with the intent to induce that fear.[31]

As articulated by the Supreme Court in *Jackson*, the constitutional standard for

sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to

---

[31] *People v. Uecker*, 91 Cal. Rptr. 3d 355, 364-66 (Ct. App. 2009) (some alterations added) (footnotes omitted).  Except for the petitioner's name and the internal footnotes, this is reproduced exactly as it appears in the original.

the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[32]  This Court must, therefore, determine whether the California Court of Appeal unreasonably applied *Jackson*.  In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial.[33]  Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution."[34]

It is a fundamental precept of dual federalism that the "States possess primary authority for defining and enforcing the criminal law."[35]  Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must undertake its inquiry by reference to the elements of the crime as set forth in state law.[36]  A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."[37]  A determination of state law by a state intermediate appellate court is also binding in a

---

[32] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see McDaniel v. Brown*, 130 S. Ct. 665, 673 (2010) (reaffirming this standard).

[33] *Jackson*, 443 U.S. at 318-19.

[34] *Id.* at 326; *see McDaniel*, 130 S. Ct. at 673-74 (citing *Jackson,* 443 U.S. at 326).

[35] *See Engle v. Isaac*, 456 U.S. 107, 128 (1982).

[36] *Jackson*, 443 U.S. at 324 n.16.

[37] *Bradshaw v. Richey,* 546 U.S. 74, 76 (2005) (citations omitted); *see West v. Am. Tel. & Tel.,* 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . ." (citation omitted)).

federal habeas action.[38]  This is especially true where the highest court in the state has denied

review of the lower court's decision.[39]  "[A]bsent a specific constitutional violation, federal

habeas corpus review of trial error is limited to whether the error 'so infected the trial with

unfairness as to make the resulting conviction a denial of due process.'"[40]  "Federal courts hold

no supervisory authority over state judicial proceedings and may intervene only to correct wrongs

of constitutional dimension."[41]  It is through this lens that this Court must view an insufficiency

of the evidence claim.

Uecker misperceives the role of a federal court in a habeas proceeding challenging a

state-court conviction.  This Court is precluded from either re-weighing the evidence or assessing

the credibility of witnesses.  Under *Jackson*, the role of this Court is to simply determine whether

there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction.[42]

In this case, the California Court of Appeal determined that there was sufficient evidence of each

---

[38] *See Hicks v. Feiock,* 485 U.S. 624, 629-30 & n.3 (1988) (citing *West*, 311 U.S. at 237-238) (noting that a state appellate court's determination of state law is binding and must be given deference).

[39] *Id.*; *see West,* 311 U.S. at 237 ("This is the more so where, as in this case, the highest court has refused to review the lower court's decision rendered in one phase of the very litigation which is now prosecuted by the same parties before the federal court."); *Shannon v. Newland*, 410 F.3d 1083, 1087 (9th Cir. 2005) (same).

[40] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 643 (1974)).

[41] *Smith v. Philips*, 455 U.S. 209, 221 (1982) (citations omitted); *see also Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) ("It is beyond dispute that we do not hold a supervisory power over the courts of the several States." (quoting *Dickerson v. United States*, 530 U.S. 428, 438 (2000))).

[42] *Cf. Schlup v. Delo*, 513 U.S. 298, 340 (1995) (citing *Jackson*, 443 U.S. at 318-319) ("[A] petitioner making a claim of actual innocence under *Carrier* falls short of satisfying his burden if the reviewing court determines that *any* juror would have found the petitioner guilty of the crime.").

element of the crimes to support Uecker's conviction.  Although it might have been possible to draw a different inference from the evidence, this Court is required to resolve that conflict in favor of the prosecution.[43]  Uecker bears the burden of establishing by clear and convincing evidence that these factual findings were erroneous,[44] a burden Uecker has failed to carry.  The record does not compel the conclusion that no rational trier of fact could have found proof of guilt, especially considering the double deference owed under *Jackson* and AEDPA.  Uecker is not entitled to relief under his first ground.

Grounds 2, 3, and 6:  Evidentiary Rulings

The Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts."[45]  "The introduction of unfairly prejudicial evidence against a defendant in a criminal trial . . . does not amount to a violation of due process unless the evidence is so extremely unfair that its admission violates fundamental conceptions of justice."[46]  "[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules."[47]  In criminal actions, "[t]he States are free to provide such procedures as they choose, including rules of evidence, provided that none of them infringes a guarantee in the Federal Constitution."[48]  The Supreme

---

[43] *See Jackson*, 443 U.S. at 326.

[44] 28 U.S.C. § 2254(e)(1).

[45] *Crane v. Kentucky*, 476 U.S. 683, 689 (1986).

[46] *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir. 1998) (citations omitted).

[47] *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983) (citation omitted); *see also Estelle v. McGuire*, 502 U.S. 62, 72 (1991).

[48] *Burgett v. Texas*, 389 U.S. 109, 113-14 (1967).

Court has made clear that federal habeas power does not allow granting relief on the basis of a belief that the state-trial court incorrectly interpreted the state-evidence code in ruling on the admissibility of evidence.[49]  In this context, the Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly," limiting them to specific guarantees enumerated in the Bill of Rights.[50]  For example, the Supreme Court has barred the introduction of evidence in state court criminal proceedings that violated the Fourth Amendment (search and seizure),[51] Fifth Amendment (confessions),[52] Sixth Amendment (Confrontation Clause),[53] and Sixth Amendment (right to counsel).[54]

On the other hand, in deciding cases involving the Federal Rules of Evidence or federal evidentiary statutes, the Supreme Court is acting in its supervisory capacity over the lower federal courts.[55]  "'Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension.'"[56]  It is in this light that this Court reviews Uecker's evidentiary claims.

---

[49] *McGuire*, 502 U.S. at 72 (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

[50] *Id.* at 73 (citing *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

[51] *Mapp v. Ohio*, 367 U.S. 643 (1961).

[52] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[53] *Crawford v. Washington*, 541 U.S. 36 (2004); *Pointer v. Texas*, 380 U.S. 400 (1965) (transcript of preliminary hearing without assistance of counsel to confront and cross-examine absent witness inadmissible).

[54] *Burgett*, 389 U.S. at 114-15 (evidence of prior conviction obtained in violation of Sixth Amendment right to counsel inadmissible).

[55] *See Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 ("It is beyond dispute that we do not hold a supervisory power over the courts of the several states." (quoting *Dickerson v. United States*, 530 U.S. 428, 438 (2000))).

[56] *Smith v. Philips*, 455 U.S. 209, 221 (1982) (citations omitted).

19

In his second ground, Uecker contends that it was prejudicial error to permit evidence of his prior uncharged "bad acts" to be submitted to the jury. The California Court of Appeal rejected Uecker's arguments, holding:

> *Defendant Has Not Established The Court Prejudicially Erred In Admitting Specific Witness Testimony Regarding Defendant's Prior Bad Acts*
>
> The court admitted evidence of defendant's prior bad acts to show intent, motive, and common plan or scheme. [Uecker] contends the court erred and denied him a fair trial by allowing numerous witnesses (V.S., D.M., K.L., J.T., K.G., S.A. and R.P.) to testify about [Uecker's] prior bad acts, because the acts were "not even close to being similar to the [current] matters." In his argument, [Uecker] makes a point of noting he is not challenging the testimony of cellmate Almeda.
>
> [Uecker] has not carried his burden to prove prejudicial error. The problem with [Uecker's] argument is that even if we were to agree with him the court erred in admitting testimony of the seven witnesses he has singled out, the evidence still included Almeda's damaging testimony. In [Uecker's] discussion of prejudice, he makes a generalized claim about the nature of stalking cases being a "media cause" and about the introduction of his prior acts turning the case into a trial of his past. But [Uecker] fails to explain why, even if the jury had not been presented with the testimony of the seven witnesses he claims should not have been introduced, he would have received a more favorable result at trial given Almeda's testimony that covered most and the worst of [Uecker's] bad acts. This is his burden, and he has failed to carry it.[57]

In his third ground, Uecker contends that the trial court abused its discretion in permitting evidence that he was a registered sex offender (on the "Megan's website") to be introduced into evidence. The Court of Appeal also rejected Uecker's arguments on this ground.

> *The Court Did Not Err In Admitting Evidence Defendant Is A Registered Sex Offender*
>
> [Uecker] contends the court erred and denied him a fair trial when it admitted into evidence that he was listed on Megan's Law database as a sex offender. The court admitted the evidence to show that [Uecker] made a credible threat toward J. with the intent to place J. in reasonable fear, in so far as he knew that she knew he is a sex offender. We find no abuse of discretion.

---

[57] *People v. Uecker*, 91 Cal. Rptr. 3d 355, 367 (Ct. App. 2009) (alterations added). Except for the petitioner's name, this appears exactly as it does in the original.

All relevant evidence is admissible unless prohibited by statute. (Evid.Code, § 351.)  "Relevant evidence" includes evidence having "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (*Id.,* § 210.)  The trial court has discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . ."  (*Id.,* § 352.) The trial court's discretionary decision to admit evidence " 'will not be disturbed on appeal unless there is a manifest abuse of that discretion resulting in a miscarriage of justice.' "

Measured against these standards of admissibility, we find no error in the admission of [Uecker's] status as a sex offender registrant.  One fact of consequence in this case was whether [Uecker's] conduct toward J. rose to the level of a credible threat to her safety.  (§ 646.9, subds. (a) & (g).)  The credible threat was the link between [Uecker's] intent to place J. in reasonable fear of her safety and the reasonable fear, if any, that J. felt.  (*Ibid.*)  J.'s knowledge that [Uecker] is a registered sex offender would tend to prove that J.'s fear of [Uecker] was reasonable. This is because it is rational that J. would interpret [Uecker's] pattern of conduct and his verbal statements in a different light when she knew he is a sex offender.

While usually the prejudice flowing from evidence disclosing that the defendant is a registered sex offender is high, such would not have been the case here.  The jury had much more damaging evidence before it regarding the details of sex offenses [Uecker] had perpetrated on numerous women in the past.  On this record, the prejudicial value of [Uecker's] status as a sex offender registrant was low and the probative value was high.  The court therefore did not err in admitting the evidence. [58]

In his sixth ground, Uecker contends that the trial court abused its discretion in allowing evidence of his prior criminal convictions to be presented to the jury.  This ground was presented in his habeas petition to the California Supreme Court.  Because the court summarily denied that

---

[58] *Id.* at 367-68 (alterations added) (footnotes omitted).  Except for the petitioner's name and the internal footnotes, this is reproduced exactly as it appears in the original.

petition, this Court presumes that the California Supreme Court decided the issue on the merits on federal grounds,[59] giving the presumed decision the same deference as a reasoned decision.[60]

Initially, this Court notes that, although the Ninth Circuit has suggested that an abuse of discretion may also amount to a constitutional violation,[61] the Supreme Court has never held that abuse of discretion is an appropriate basis for granting federal habeas relief.  Indeed, quite to the contrary, the Supreme Court has suggested that, while abuse of discretion is an appropriate standard on direct review, in a federal habeas proceeding it is not.[62]

Federal Rule of Evidence 404, as does its counterpart, California Evidence Code § 1101, generally prohibits the introduction of evidence of extrinsic acts that might adversely reflect on the actor's character, unless that evidence bears upon a relevant issue in the case such as motive, opportunity, or knowledge.[63]  No preliminary showing is necessary before such evidence may be

---

[59] *See Coleman* v. Thompson, 501 U.S. 722, 740 (1991) ("The presumption at present applies only when it fairly appears that a state court judgment rested primarily on federal law or was interwoven with federal law, that is, in those cases where a federal court has good reason to question whether there is an independent and adequate state ground for decision.").

[60] *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011) (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

[61] *See Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc) ("A particular abuse of discretion by a state court may amount also to a violation of the Constitution, but not every state court abuse of discretion has the same effect.").

[62] *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) ("It is not even whether it was an abuse of discretion for her to have done so—the applicable standard on direct review. The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application of . . . clearly established Federal law." (citing 28 U.S.C. § 2254(d)(1))).

[63] This Court notes that to the extent the Supreme Court has addressed the issue, it has stated:  "Because we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime."  *Estelle v. McGuire*, 502 U.S. 62, 75 n.5 (1991).

introduced for a proper purpose.[64]  Federal appellate courts review de novo the question of

"whether evidence falls within the scope of Rule 404(b)."[65]  "If offered for such a proper

purpose, the evidence is subject only to general strictures limiting admissibility such as Rules

402 and 403."[66]  There is a split among the circuit courts as to the proper standard of review, de

novo or abuse of discretion, to be applied to the question of whether evidence falls within the

scope of Rule 404(b).  The Ninth Circuit applies a de novo standard,[67] while the Second Circuit

applies an abuse of discretion standard.[68]  California employs an abuse of discretion standard on

appellate review of § 1101(b) rulings.[69]  The Supreme Court has held that in ruling on whether

evidence is properly admitted under Rule 404(b), this Court must consider whether: (1) the prior

acts evidence was offered for a proper purpose; (2) the evidence was relevant to a disputed issue;

---

[64] *Huddleston v. United States*, 485 U.S. 681, 687-88 (1988).

[65] *See United States v. Montgomery*, 384 F.3d 1050, 1061 (9th Cir. 2004) (citation omitted).

[66] *Huddleston*, 485 U.S. at 688; *United States v. Curtin*, 489 F.3d 935, 944 (9th Cir. 2007) (noting that once it has been established that the evidence at issue serves an admissible purpose, such as establishing motive or intent, the only conditions justifying the exclusion of the evidence are those set forth in Rule 403); Fed. R. Evid. 402 ("Relevant Evidence generally Admissible; Irrelevant Evidence Inadmissible."); Fed. R. Evid. 403 ("Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion or Waste of Time.").

[67] *Montgomery*, 384 F.3d at 1061.

[68] *United States v. Paulino*, 445 F.3d 211, 221 (2d Cir. 2006) (citations omitted).

[69] *See People v. Kipp*, 956 P.2d 1169, 1181 (Cal. 1998) (citations omitted) (stating that an admissibility ruling under § 1101(b) is essentially a determination of relevance that is reviewed for abuse of discretion).  Given the split between the circuits and the fact that the Supreme Court has not expressly ruled on this question, it cannot be said that the use of an abuse of discretion standard is an unreasonable application of federal law as established by the Supreme Court. *Kessee v. Mendoza-Powers*, 574 F.3d 675, 679 (9th Cir. 2009) ("Because the Supreme Court has not given explicit direction and because the state court's interpretation is consistent with many other courts' interpretations, we cannot hold that the state court's interpretation was contrary to, or involved an unreasonable application of, Supreme Court precedent.").

(3) the probative value of the prior act evidence substantially outweighed the danger of its unfair prejudice; and (4) the court, if requested, administered an appropriate limiting instruction.[70] Under California Evidence Code § 1102(b), as to "circumstantial evidence, its admissibility depends upon three principal factors: (1) the materiality of the fact sought to be proved or disproved; (2) the tendency of the uncharged crime to prove or disprove the material fact; and (3) the existence of any rule or policy requiring the exclusion of relevant evidence."[71]

Federal Rule of Evidence 403, the federal counterpart to California Evidence Code § 352, permits the exclusion of evidence if its probative value is "outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules. Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . ."[72] California employs a similar rule.[73]

In this case, both the decision of the Court of Appeal and the presumed decision of the California Supreme Court applied the California evidentiary rules in the same way that their federal counterparts are applied. Consequently, given the deference that must be given to state

---

[70] *Huddleston*, 485 U.S. at 691-92 (citations omitted).

[71] *People v. Thompson*, 611 P.2d 883, 888 (Cal. 1980) (citations omitted).

[72] *United States v. Abel,* 469 U.S. 45, 54 (1984); *see Boyd v. City and County of San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009) ("The decision to admit potentially prejudicial evidence under Rule 403 is 'committed to the sound discretion of the trial court.'" (quoting *United States v. Blitz*, 151 F.3d 1002, 1008 (9th Cir.1998))).

[73] *See People v. Harris*, 118 P.3d 545, 565 (Cal. 2005) ("We review for abuse of discretion a trial court's rulings on the admissibility of evidence.").

court evidentiary rulings under *Crane-McGuire-Burgett* and in light of *Andrade-Williams-Schriro-Richter*, this Court cannot say that the decisions of the California Courts were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state courts rendered their decisions or were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[74]   Uecker is not entitled to relief under his second, third and sixth grounds.

Grounds 4 and 5:  Sentencing Issues

In his fourth ground, Uecker contends that the trial court abused its discretion in not striking a sufficient number of prior convictions to avoid the imposition of the twenty-five years to life sentences.  The Court of Appeal rejected Uecker's position.

> *The Trial Court Did Not Abuse Its Discretion In*
> *Failing To Dismiss Defendant's Strikes*
>
> [Uecker] contends the trial court abused its discretion in refusing to dismiss a "sufficient [number of] strikes . . . to avoid 25 years to life terms for nonviolent stalking offenses."  We disagree.
>
> While the trial court has the power to dismiss a strike conviction, an appellate court will not disturb the trial court's ruling denying defendant's request to dismiss his strike conviction absent an affirmative showing of an abuse of discretion.
>
> Here there was no abuse, given [Uecker's] criminal history that the court relied on when denying [Uecker's] *Romero* motion.  According to the trial testimony and the probation report, [Uecker] had at the very least a criminal record that included the following: a court martial conviction for assaulting a female soldier with the intent to commit robbery; convictions for attempted kidnapping for the incident where he impersonated an undercover police officer and assaulted S.A.; and convictions for forcible rape, forcible sodomy, forcible lewd acts on a child, and kidnapping resulting in a 29–year prison sentence for the incident where he lured R.P. to his trailer under the guise of seeking babysitting services.  When he was released from prison after serving time on that sentence, he twice violated his

---

[74] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

parole—once in 2005 and again in 2006.  He was still on parole when he committed the instant crimes.  On this record, the court had a reasonable basis for not exercising its discretion to dismiss defendant's strikes.[75]

As noted above, abuse of discretion is not an appropriate standard in a federal habeas proceeding.  Consequently, Uecker's fourth ground fails to present a question of federal constitutional dimension cognizable in this Court in this proceeding.

In his fifth ground, Uecker contends that the imposition of an aggregate sentence of fifty years to life constitutes cruel and usual punishment under both the California and the United States Constitutions.  The Court of Appeal rejected Uecker's position.[76]

## B

### *Federal Constitution*

Turning to [Uecker's] claim based on federal law, the Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment, but strict proportionality between crime and punishment is not required.  "'Rather, [the Eighth Amendment] forbids only extreme sentences that are "grossly disproportionate" to the crime.'"  (*People v. Cartwright* (1995) 39 Cal.App.4th 1123, 1135, 46 Cal.Rptr.2d 351.)

The Supreme Court of the United States has upheld statutory schemes that result in life imprisonment for recidivists upon a third conviction for a nonviolent felony in the face of challenges that such sentences violate the federal constitutional prohibition against cruel and unusual punishment.  (See *Ewing v. California* (2003) 538 U.S. 11, 123 S.Ct. 1179, 155 L.Ed.2d 108 [25-year-to-life sentence under three strikes law for theft of three golf clubs worth $399 each]; *Lockyer v. Andrade* (2003) 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 [two consecutive terms of 25 years to life for two separate thefts of less than $150 worth of videotapes].)

In the present case, as we discussed in connection with his California constitutional claim, [Uecker's] sentence is not grossly disproportionate to the crimes

---

[75] *People v. Uecker*, 91 Cal. Rptr. 3d 355, 368 (Ct. App. 2009) (alterations added) (citations omitted).

[76] Because his claim under the California Constitution is not cognizable in a federal habeas proceeding, this Court reviews solely the Court of Appeal's decision addressing the federal constitutional grounds.

and recidivism for which he is being punished.  As a result, his Eighth Amendment claim fails as well.[77]

Although Uecker may have received a severe sentence and the Eighth Amendment prohibits sentences that are grossly disproportionate to the crime, "outside the context of capital punishment, successful challenges to the proportionality of particular sentences [will be] exceedingly rare."[78]  The Ninth Circuit has held that "'only extreme sentences that are grossly disproportionate to the crime' violate the Eighth Amendment."[79]

To determine proportionality, a court must examine: "(1) 'the gravity of the offense and the harshness of the penalty'; (2) 'the sentences imposed on other criminals in the same jurisdiction'; and may include (3) 'the sentences imposed for commission of the same crime in other jurisdictions.'"[80]  Balanced against the proportionality principle is the corollary principle that the determination of prison sentences is a legislative prerogative not within the province of the courts.[81]  Also, as noted in 1991, the Supreme Court's "proportionality decisions have not been clear or consistent in all respects," and the precise contours of its proportionality decisions have been unclear.[82]  Nor does it appear that in the ensuing twenty years that the Supreme Court's decisions have become any more clear or consistent.  It is against this backdrop of the

---

[77] *Uecker*, 91 Cal. Rptr.3d at 369 (some alterations added).

[78] *Solem v. Helm,* 463 U.S. 277, 289-90 (1983) (citation omitted).

[79] *Cacoperdo v. Demosthenes,* 37 F.3d 504, 507 (9th Cir.1994) (quoting *United States v. Bland,* 961 F.2d 123, 129 (9th Cir.1992)).

[80] *Id.* at 507 (quoting *Solem,* 463 U.S. at 290-92).

[81] *See Rummel v. Estelle*, 445 U.S. 263, 275-76 (1980) (noting that sentencing has a subjective component and thus sentencing is better dealt with by the legislatures and not the courts).

[82] *Harmelin v. Michigan*, 501 U.S. 957, 996-98 (1991) (Kennedy, J., concurring).

law as it existed at the time the California courts rendered their decisions that those decisions must be examined.[83]

Initially the Court looks to *Rummel*, *Solem*, *Ewing*, and *Harmelin* for guidance.  In *Rummel*, the Supreme Court rejected the argument that a life sentence with the possibility of parole upon conviction of obtaining $120.75 by false pretenses violated the Eighth Amendment where the defendant's criminal history consisted solely of the fraudulent use of a credit card to obtain $80 worth of goods and passing a forged check in the amount of $28.36.[84]  In *Solem*, the Supreme Court found a sentence of life without the possibility of parole upon conviction of uttering a no account check for $100 based on a criminal history of seven nonviolent felonies violated the Eighth Amendment.[85]  As noted by the Court of Appeal, in *Ewing*, the Supreme Court upheld a twenty-five years to life sentence for the theft of three golf clubs worth $399 each.[86]  In *Harmelin*, the Supreme Court upheld against an Eighth Amendment challenge a mandatory life sentence without the possibility of parole upon conviction for possession of more than 650 grams of cocaine without consideration of mitigating factors, such as the fact the defendant had no prior felony convictions.[87]

In light of *Rummel*, *Solem*, *Ewing* and *Harmelin*, this Court cannot say that the decision of the California Court of Appeal was "contrary to, or involved an unreasonable application of,

---

[83] 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

[84] 445 U.S. at 265-67, 285.

[85] 463 U.S. at 277-279.

[86] *Ewing v. California*, 538 U.S. 11, 11-12 (2003).

[87] 501 U.S. at 958-59.

clearly established Federal law, as determined by the Supreme Court of the United States" or

"was based on an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding."[88]  Nor, can this Court find that the state court unreasonably applied the

correct legal principle to the facts of the Uecker's case within the scope of *Andrade-Williams-*

*Schriro-Richter*, i.e., the state-court decision was not more than incorrect or erroneous, its

application of clearly established federal law was not objectively unreasonable.  Uecker is not

entitled to relief under either his fourth or fifth ground.

<u>Ground 7:  Judicial Bias</u>

Uecker contends that the trial judge had formed a predisposed opinion that Uecker was

guilty that resulted in bias and prejudice against him.  Uecker argues that this bias manifested

itself in the fact that the trial court abused its discretion in evidentiary rulings.  This ground, like

his sixth ground, was presented in his habeas petition to the California Supreme Court.  Because

the court summarily denied that petition, this Court will presume that the California Supreme

Court decided the issue on the merits on federal grounds, giving the presumed decision the same

deference as a reasoned decision.[89]

---

[88] 28 U.S.C. § 2254(d).

[89] *See Coleman v. Thompson*, 501 U.S. 722, 740 (1991) ("The presumption at present
applies only when it fairly appears that a state court judgment rested primarily on federal law or
was interwoven with federal law, that is, in those cases where a federal court has good reason to
question whether there is an independent and adequate state ground for the decision."); *see also
Harris v. Reed*, 489 U.S. 255, 263 (1989); *Harrington v. Richter*, 131 S. Ct. 770, 784-85
(rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

Uecker's primary complaints concern rulings made by the judge during the pretrial proceedings and trial that Petitioner describes as being erroneous, depriving him of his constitutional rights.  As the Supreme Court stated in *Liteky*:[90]

> First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion.  See *United States v. Grinnell Corp.,* 384 U.S. at 583, 86 S.Ct., at 1710.  In and of themselves (*i.e.,* apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved.  Almost invariably, they are proper grounds for appeal, not for recusal.  Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.  Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.  They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.[91]

It is also noteworthy that notwithstanding the fact that Uecker attacked these "erroneous prejudicial rulings" on direct appeal, he did not prevail in overturning any one of them.

Uecker's allegations in this case do not come close to establishing bias, let alone bias sufficient to require recusal or disqualification of the trial judge.  Uecker is not entitled to relief under his seventh ground.

Ground 8:  Ineffective Assistance of Counsel

In contending that he was denied the effective assistance of counsel, Uecker presents a veritable laundry list of complaints, including:  (1) failure to present an alibi defense; (2) the failure to present witnesses for the defense; (3) in examining defense witnesses the questions

---

[90] *Liteky v. United States*, 510 U.S. 540 (1994).

[91] *Id.* at 555.

were misleading, in the wrong form and showed a lack of tactical skills; (4) failure to object to

the admission of recordings and letters as inadmissible hearsay; (5) failure to obtain the

testimony of expert witnesses (psychologists and psychiatrists); (6) failure to argue the lack of

aggravating evidence to support the conviction as a felony instead of a misdemeanor; (7) failure

to object to the testimony of, and adequately cross-examine prosecution witnesses; and (8)

counsel refused to permit Uecker to testify.

This ground was also presented in his habeas petition to the California Supreme Court.

Because the court summarily denied that petition, this Court will presume that the California

Supreme Court decided the issue on the merits on federal grounds, giving the presumed decision

the same deference as a reasoned decision.[92]

Under *Strickland*, to demonstrate ineffective assistance of counsel, Uecker must show

both that his counsel's performance was deficient and that the deficient performance prejudiced

his defense.[93]   A deficient performance is one in which "counsel made errors so serious that

counsel was not functioning as the counsel guaranteed by the Sixth Amendment."[94]   Uecker must

show that defense counsel's representation was not within the range of competence demanded of

attorneys in criminal cases, and that there is a reasonable probability that, but for counsel's

---

[92] *See Coleman*, 501 U.S. at 740 (1991) ("The presumption at present applies only when it fairly appears that a state court judgment rested primarily on federal law or was interwoven with federal law, that is, in those cases where a federal court has good reason to question whether there is an independent and adequate state ground for the decision."); *see also Harris*, 489 U.S. at 263; *Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

[93] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[94] *Id*.

ineffectiveness, the result would have been different.[95]  An analysis that focuses "solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective."[96]  An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either one of the two *Strickland* prongs.[97]

*Strickland* and its progeny do not mandate that this Court act as a "Monday morning quarterback" in reviewing tactical decisions.[98]  Indeed, the Supreme Court admonished in *Strickland*:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action

---

[95] *Hill v. Lockhart,* 474 U.S. 52, 57 (1985) (citing *Strickland,* 466 U.S. at 694).

[96] *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993); *see Strickland*, 466 U.S. at 687; *see also Kimmel v. Morrison*, 477 U.S. 365, 374 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." (citing *Strickland,* 466 U.S. at 687)); *United States v. Cronic*, 466 U.S. 648, 656 (1984) ("The right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial.  Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated." (citations omitted)).

[97] *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

[98] *See Harris v. Reed*, 894 F.2d 871, 877 (7th Cir. 1990).

might be considered sound trial strategy.  There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.[99]

In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro, supra,* at 473, 127 S.Ct. 1933.  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.  See *Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").[100]

It is through this doubly deferential lens that a federal habeas court reviews *Strickland* claims under the § 2254(d)(1) standard.[101]

The Supreme Court, applying the "doubly deferential standard," has made clear that when adjudicating ineffective assistance of counsel claims in federal habeas proceedings, unlike the situation on direct review, focus is not on whether counsel's performance fell below the *Strickland* standard.  Rather, the focus is on whether the state-court decision holding that counsel was not ineffective constituted an "*unreasonable* application of federal law[,] [which] is different from an *incorrect* application of federal law."[102]

> Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it

---

[99] 466 U.S. at 689 (internal quotation marks and citations omitted).

[100] *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009).

[101] *See id.* (citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)).

[102] *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

33

must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.[103]

While judicial inquiry into counsel's performance under *Strickland* must be highly deferential, it is "by no means insurmountable," but nonetheless remains "highly demanding."[104] "Only those habeas petitioners who can prove under *Strickland* that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ and will be entitled to retrial."[105]  Uecker bears the burden of proving that counsel's trial strategy was deficient. "[Uecker] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"[106]  "[Uecker] bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy."[107]  "In determining whether the defendant received effective assistance of counsel, 'we will neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight,' but rather, will defer to counsel's sound trial strategy."[108]  "Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment."[109]

---

[103] *Id.* at 786.

[104] *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986).

[105] *Id.*

[106] *Strickland*, 466 U.S. at 689 (alteration added) (citation omitted).

[107] *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir. 2001) (alteration added) (citing *Strickland*, 466 U.S. at 689).

[108] *Id.* (quoting *Strickland*, 466 U.S. at 689).

[109] *Strickland*, 466 U.S. at 681 (citation omitted).

"A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."[110]  The court must then consider those acts or omissions against "prevailing professional norms."[111]  Even then, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."[112]

Uecker has not met this heavy burden.  He has shown no evidence indicating that counsel was unreasonable or ineffective for selecting his chosen trial strategy.  He presented no alternate attorney's determination challenging counsel's decision to pursue an intoxication defense.  He has not quoted any "[p]revailing norms of practice as reflected in American Bar Association standards and the like" indicating that counsel acted outside these norms.[113]  Most importantly, however, other than make allegations in broad, conclusory terms, Uecker has presented no evidentiary support or legal argument that would satisfy either *Strickland* prong.

The petition must specify all the grounds for relief available to the petitioner and the facts supporting each ground.[114]  Mere conclusory statements or broad descriptions are insufficient.  The petition must contain sufficient facts that point to a real possibility that federal constitutional error occurred.[115]  Uecker's Petition does not meet this standard.  For example, Uecker has not

---

[110] *Id*. at 690.

[111] *Id*. at 688, 690.

[112] *Id*. at 690.

[113] *Id.* at 688 (citation omitted).

[114] Rules Governing Section 2254 Cases in the U.S. Dist. Courts, Rule 2(c) (2011).

[115] *Mayle v. Felix*, 545 U.S. 644, 655-56 (2005).

articulated how an alibi defense was relevant to the charges or even what that alibi defense might have been.  He has not only failed to attach an affidavit or declaration of his own testimony, but has also failed to explain what that testimony would have been.  Uecker has not identified any witness or made a proffer of what testimony each uncalled defense witness would have given at trial, let alone provided the affidavit or declaration of the witness.  Other than to allege that he was an out-patient for therapy, Uecker has not shown how any psychologist or psychiatrist could have provided any testimony relevant to Uecker's defense or otherwise "vouched" for him.  He has not identified any particular item of evidence or testimony to which counsel failed to object or the basis upon which an objection would have been well taken.[116]  Uecker has provided no example of what questions should have been posed on cross-examination but were not.  In short, Uecker has failed to provide any meaningful factual basis or legal argument that points to a real possibility that his counsel's performance was deficient.

This Court cannot say that the presumed decision of the California Supreme Court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[117] Nor, viewing the matter through the doubly-deferential lens of *Mirzayance-Richter*, can this Court find that the state court unreasonably applied the correct legal principle to the facts of the Uecker's case within the scope of *Andrade-Williams-Schriro-Richter*; i.e., the state-court decision

---

[116] Uecker does contend that the letters constituted inadmissible hearsay.  This Court notes that the letters referred to in the decision of the Court of Appeal either were not hearsay, i.e., not admitted for the truth of the statement made but for the fact it was made, or were within a recognized exception to the hearsay rule.

[117] 28 U.S.C. § 2254(d).

was not more than incorrect or erroneous, its application of clearly established federal law was not objectively unreasonable.  Uecker has failed to establish that counsel committed any error that was so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment or that his defense was prejudiced, as required by *Strickland-Hill*.  Uecker is not entitled to relief under his eighth ground.

Ground 9:  Double Jeopardy/*Ex Post Facto*

In this ground, Uecker makes three arguments in support of his contention that his sentence violated the Double Jeopardy Clause.  First, Uecker argues that he was solely convicted on his past criminal conduct, not his current conduct.  Second, he argues that his sentence under the "three-strikes" law allowed him to be punished twice for his prior criminal convictions.  Third, Uecker argues that, by sentencing him to consecutive sentences on the two charges, he is being punished twice for a single offense.  Uecker also argues that, because it is based upon prior convictions, his sentencing under the "three-strikes" law violates the *Ex Post Facto* Clause.  This ground, like the sixth, seventh, and eighth was presented in his habeas petition to the California Supreme Court.  Because the court summarily denied that petition, this Court will presume that the California Supreme Court decided the issue on the merits on federal grounds, giving the presumed decision the same deference as a reasoned decision.[118]

----

[118] *See Coleman v. Thompson*, 501 U.S. 722, 740 (1991) ("The presumption at present applies only when it fairly appears that a state court judgment rested primarily on federal law or was interwoven with federal law, that is, in those cases where a federal court has good reason to question whether there is an independent and adequate state ground for the decision."); *see also Harris v. Reed*, 489 U.S. 255, 263 (1989); *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

Uecker's argument that the California "three-strikes" law violates the double jeopardy clause is foreclosed by the Supreme Court's decision in *Ewing v. California*.[119]  Uecker's *ex post facto* challenge fails for a similar reason.  As applicable to this argument, an *ex post facto* law is one that retroactively punishes a person for conduct that was not criminal at the time of the conduct, or increases the punishment for that conduct.[120]  Because, as explained in *Ewing*, a criminal defendant is not being punished under the "three-strikes" law for his prior conduct, but for his current "enhanced" offense, it survives an *ex post facto* challenge.[121]  Uecker is not entitled to relief under the arguments advanced in his ninth ground.

---

[119] 538 U.S. 11, 25-26 (2003) (holding that recidivism statues do not violate the Double Jeopardy Clause because the enhanced punishment for the later offense is a stiffened penalty for the latest offense, which is considered an aggravated offense because it is a repetitive one).

[120] *See Stogner v. California*, 539 U.S. 607, 610-14 (2003) (discussing the categories of laws that run afoul of the *Ex Post Facto* Clause).

[121] 538 U.S. at 11-14.

## V.  CONCLUSION AND ORDER

Uecker is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.[122]  Any further request for a Certificate of Appealability must be addressed to the Court of Appeals.[123]

The Clerk of the Court is to enter judgment accordingly.

Dated: December 20, 2011.

/s/ James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
United States District Judge

---

[122] 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's  resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003))).

[123] *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.